IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IBRAHIM K.M. ALMABRUK, et al.,** | : | **Civil No. 1:22-CV-01054** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TERRY ROBINSON, et al.,** | : | |
| | : | |
| **Defendants.** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

In this case of first impression, a former Libyan diplomat and his family seek this court's intervention under the Administrative Procedure Act to adjust their immigration statuses to remain in the United States. They argue that the government arbitrarily and capriciously determined that they did not have the statutorily required compelling reasons for not wanting to return to Libya under an obscure and seldom cited section of Title 8. The government counters that this court is without jurisdiction to review the decision because the specific adjustment that Plaintiffs are seeking is solely committed to the discretion of the Secretary of Homeland Security. Presently before the court is a motion to dismiss the amended complaint for lack of subject matter jurisdiction filed by Defendants. (Doc. 28.) For the reasons set forth below, the motion will be granted.

## I.  **BACKGROUND**

Plaintiffs Ibrahim Almabruk and his wife Massauda Elbizdi, daughter Shimma Almabruk, and son Amer Almabruk are noncitizens of the United States living in Harrisburg, Pennsylvania. (Doc. 24 ¶¶ 8-11.) Ibrahim was previously a financial counselor to the Permanent Mission of the State of Libya to the United Nations, and as a result, he and his family held G-1 nonimmigrant status.[1] (Doc. 24 ¶¶ 8-11, 16-17.) In 2011, a mass uprising occurred in Libya against Mu'ammar Al-Gaddafi and his longstanding regime, to which the Gaddafi forces responded with violence against the populace. (Doc. 24 ¶ 19.)

Ibrahim and other Libyan Mission members to the United Nations publicly defected from the Gaddafi government on television, with Ibrahim visible on a CNN broadcast of the event. (Doc. 24 ¶¶ 20-21.) Due to his defection, Ibrahim and his family were repeatedly threatened, and soldiers loyal to Gaddafi burned the Almabruk's Libyan home to the ground. (Doc. 24 ¶¶ 22-23.) Plaintiffs thus believe that they will be targeted if they return to Libya and have provided a report by an expert on Libyan affairs supporting this belief. (Doc. 24 ¶¶ 24-25.)

---

[1] This status is for diplomatic representatives of foreign governments to international organizations and the immediate family members of those representatives. 8 U.S.C. § (a)(15) (G)(i)-(ii).

Plaintiffs' G-1 nonimmigrant status was revoked on August 7, 2017.[2] (Doc. 24, Ex. B, C.) Amer filed an I-485 application on May 19, 2020, seeking an adjustment of status under "Section 13."[3] (Doc. 24, Ex. B.) In a letter dated December 14, 2021, the United States Citizenship and Immigration Services ("USCIS") denied his application, indicating that he failed to provide compelling reasons not to return to Libya. (Doc. 24 ¶ 28.)

Thereafter, on July 6, 2022, Amer initiated this action by filing a complaint against Defendants: USCIS; Terri Robinson, in her official capacity as Director of the National Benefits Center at USCIS; Alejandro Mayorkas in his official capacity as the Secretary of the Department Homeland Security; and Anthony Blinken in his official capacity as the Secretary the Department of State. (Doc. 1.) While a motion to dismiss the action was pending, on November 14, 2023, USCIS issued denials of I-485 applications filed by Ibrahim, Massauda, and Shimma, and issued a new denial of Amer's initial I-485 application. (Doc. 24 ¶ 37, Ex. C.)

Plaintiffs then filed an amended complaint on January 12, 2024. (Doc. 24.) In it, they assert that Defendants violated the Administrative Procedure Act ("APA") by failing to adjust Plaintiffs' immigration status despite compelling reasons and

---

[2] The court assumes that his wife and childrens' visas were terminated the same day as Ibrahim's since they depended on his UN service. 8 U.S.C. § 1101(a)(15)(G)(i).

[3] Section 13 refers to Section 13 of Pub. L. No. 85-316, 71 Stat. 639, which is codified at 8 U.S.C. § 1255b. An I-485 application refers to the form required to apply for an adjustment of status under Section 13.

request this court to either (1) hold unlawful and set aside the denial to adjust; (2) order Defendants to approve the adjustment; or (3) order Defendants to issue a new decision in accordance with the law.  (Doc. 24 ¶¶ 40-49; Prayer for Relief at p. 16.)

Defendants have filed a motion to dismiss the amended complaint challenging this court's jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the statute under which Plaintiffs seek adjustment of status is committed to the sole discretion of the Secretary of the Department of Homeland Security, and is thus nonreviewable by this court. (Docs. 28, 30.) As noted previously, this is an issue of first impression, as no other court, at least to this court's knowledge, has determined whether decisions made pursuant to Section 13 are committed by law to agency discretion. The motion has been fully briefed and is ripe for review.

## I.   <u>STANDARD OF REVIEW</u>

"A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 537 (M.D. Pa. 2002) (quoting *Ballenger v. Applied Digital Solutions, Inc.*, 189 F. Supp. 2d 196, 199 (D. Del. 2002)). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

A motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Petruska*, 462 F.3d at 302 n.3; *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *see also Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000). A "facial attack" assumes that the allegations of the complaint are true but contends that the pleadings fail to present an action within the court's jurisdiction. *Mortensen*, 549 F.2d at 891. Such a motion should only be granted if it appears with certainty that the court's assertion of jurisdiction would be improper. *Id.*; *Carpet Grp.*, 227 F.3d at 69. A "factual attack" argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, thereby causing the matter to fall outside the court's jurisdiction. *Mortensen*, 549 F.2d at 891. On a factual attack, the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue. *Id.*; *Carpet Grp.*, 227 F.3d at 69.

## II.   **DISCUSSION**

This case involves the interplay between two important and competing notions in the APA: that it encompasses "a basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), while at the same time circumscribing judicial review when agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The APA was enacted in 1946 and set forth "a new, basic and comprehensive regulation of procedures in many agencies . . .." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 523 (1978) (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950)). Included in its comprehensive scheme, the APA provides for judicial review, stating, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. There must be "clear and convincing evidence of a contrary legislative intent" to preclude judicial review. *M.B. v. Quarantillo*, 301 F.3d 109, 112 (3d Cir. 2002) (quoting *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 778 (1985)).

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found" not to meet six separate standards, including that a court must set aside agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971) (citing 5 U.S.C. § 706). At the same time, however, these provisions do not apply to the extent that "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2).

The Supreme Court has noted the "tension" between the prohibition on reviewing actions "committed to agency discretion" and the APA's plain language

commanding courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Heckler v. Chaney*, 470 U.S. 821, 829 (1985)). Indeed, a court could never determine whether an agency abused its discretion if all "matters committed to agency discretion were unreviewable." *Id.* Thus, the exception to judicial review in § 701(a)(2) has been read quite narrowly, "restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). "Only if the governing provisions affirmatively circumscribe the agency's authority, constraining its decision in a definite and defined manner, may a court competently assess the validity of its action." *Purveegiin v. Gonzales*, 448 F.3d 684, 689 (3d Cir. 2006).

Situations where § 701(a)(2) applies involve "a complicated balancing of a number of factors which are peculiarly within the agency's expertise." *Gentile v. SEC*, 974 F.3d 311, 319 (3d Cir. 2020) (citing *Chaney*, 470 U.S. at 831). Further, there is precedent describing a "tradition of nonreviewability" regarding certain classes of decisions committed to an agency's discretion, including decisions (1) to refrain from enforcement or investigative activity, *see Gentile*, 974 F.3d at 319 n. 12 (collecting cases); (2) implicating intelligence and national security concerns,

*Webster v. Doe*, 486 U.S. 592 (1988); and (3) about the spending of lump-sum appropriations *Lincoln*, 508 U.S. at 192-193.

It is within this paradigm that this court must determine whether the government's decision to deny Plaintiffs a status adjustment under Section 13 was committed to agency discretion by law or whether that decision was an abuse of discretion or arbitrary and capricious, and thus, reviewable. To make this determination, the court must look to the relevant statute.

Section 13 of Pub. L. No. 85-316, 71 Stat. 639, codified at 8 U.S.C. 1255b, allows the Secretary of Homeland Security,[4] after consultation with the Secretary of State, to adjust the status of A-1, A-2, G-1, and G-2 nonimmigrant diplomatic visa holders[5] to that of lawful permanent residents. 8 U.S.C. § 1255b. Specifically, Section 13 states in its entirety:

> Notwithstanding any other provision of law—
>
> (a)Application. Any alien admitted to the United States as a nonimmigrant under the provisions of either section 101(a)(15)(A)(i) or (ii) or 101(a)(15)(G)(i) or (ii) of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(A)(i), (ii), (G)(i), (ii)], who has failed to maintain a status under any of those provisions, may apply to the Attorney

---

[4] The statute refers to the Attorney General, but the Homeland Security Act of 2002 transferred this authority to the Secretary of Homeland Security. 6 U.S.C. § 271(b). As the government correctly notes in its brief, the statute and some case law still refer to the Attorney General, so those terms will be used interchangeably.

[5] These statuses are for diplomatic representatives of foreign governments to the United States or to international organizations and the immediate family members of those representatives. 8 U.S.C. § (a)(15)(A)(i)-(ii), (G)(i)-(ii).

General for adjustment of his status to that of an alien lawfully admitted for permanent residence.

(b)Record of admission. If, after consultation with the Secretary of State, it shall appear to the satisfaction of the Attorney General that the alien has shown compelling reasons demonstrating both that the alien is unable to return to the country represented by the government which accredited the alien or the member of the alien's immediate family and that adjustment of the alien's status to that of an alien lawfully admitted for permanent residence would be in the national interest, that the alien is a person of good moral character, that he is admissible for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.], and that such action would not be contrary to the national welfare, safety, or security, the Attorney General, in his discretion, may record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for adjustment of status is made.

(c)Report to the Congress; resolution not favoring adjustment of status; reduction of quota. A complete and detailed statement of the facts and pertinent provisions of law in the case shall be reported to the Congress with the reasons for such adjustment of status. Such reports shall be submitted on the first day of each calendar month in which Congress is in session. The Secretary of State shall, if the alien was classifiable as a quota immigrant at the time of his entry, reduce by one the quota of the quota area to which the alien is chargeable under section 202 of the Immigration and Nationality Act [8 U.S.C. 1152] for the fiscal year then current or the next following year in which a quota is available. No quota shall be so reduced by more than 50 per centum in any fiscal year.

(d)Limitations. The number of aliens who may be granted the status of aliens lawfully admitted for permanent residence in any fiscal year, pursuant to this section, shall not exceed fifty.

8 U.S.C. § 1255b.

In sum, Section 13 requires that an applicant show: (1) admission to the

United States as an A1 or A2 foreign government official or G1 or G2 international

organization representative; (2) failure to maintain that admission status; (3) compelling reasons the applicant cannot return to the country of accreditation; (4) good moral character; (5) admissibility to the United States; and (6) that adjustment is in the national interest and not contrary to the national welfare, safety, or security. 8 U.S.C. § 1255b. Regulations further require that an applicant must have performed diplomatic or semi-diplomatic duties to be eligible for adjustment. 8 C.F.R. § 245.3. To apply for a Section 13 adjustment, an applicant must file an I-485 application. *Id.*

Defendants make three arguments in favor of dismissal. First, that the express language of Section 13 gives the Secretary of Homeland Security the sole discretion to approve adjustment of status. (Doc. 30 at p. 11.) Second, that the considerations at play are uniquely within the Secretary of Homeland Security's expertise. (*Id.*) Third, that the statute's failure to provide a definition of "compelling reasons" leave courts without a meaningful standard to apply to the Secretary's decisions. (*Id.* at p. 11-12.) Relying heavily on a Third Circuit case concerning a different provision of immigration law, *M.B. v. Quarantillo*, 301 F.3d 109, 113 (3d Cir. 2002), Plaintiffs assert that where an agency has announced a rule or followed a "settled court of adjudication," a manageable standard emerges against which a court can judge the agency's decision. (Doc. 34 at p. 8.) Here, they argue that because there is longstanding jurisprudence within the Administrative Appeals Office expounding

upon compelling reasons while evaluating denials Section 13 applications, such a settled course of adjudications exists.

After careful consideration of the statute, legislative history, and case law, this court concludes that this is one of the rare cases where judicial review is unavailable.

Initially, there is no meaningful standard against which this court can compare Defendants' decision, and thus there is "no law to apply." Congress did not define "compelling reasons" and the agency has not done so through regulation. While Plaintiffs make a persuasive case about a "settled course of adjudication" through cited Administrative Appeals Office decisions, which go into detail about "compelling reasons," this is not enough. As the Third Circuit explained in *Quarantillo*, although an agency's "discretion may be unfettered at the outset, if an agency 'announces and follows – by rule or by settled course of adjudication – a general policy by which its exercise of discretion will be governed, an *irrational departure from the policy* . . . could constitute agency action that must be overturned . . . .*" Quarantillo*, 301 F.3d at 112-13 (quoting *INS v. Yang*, 519 U.S. 26, 32 (1996)) (*emphasis added*). Plaintiffs do not point to an "irrational departure" from any policy to the extent that the cited decisions pronounced a general policy at all. The decisions thoroughly define "compelling reasons," before explaining why the applicants in those cases plainly failed to meet that definition. (Docs. 34-2, 34-3, 34-4, 34-5.) The decisions do not announce a standard by against which this court can measure

Defendant's decision. For instance, one Administrative Appeals Office decision states that based on the legislative history, an applicant would need to show "significant political change (e.g., Communist and other uprisings, aggressions, or invasion) in the country of accreditation . . .." (*In Re: 2713120*, 2021 WL 2037014 (DHS) (2021) (citing *Analysis of Bill to Amend the Immigration and Nationality Act*, 85th Cong., 103 Cong. Rec. 14660 (1957) (statement of Senator John F. Kennedy)). While courts are certainly capable of observing whether there has been a change in government in a country, a revolution, or an invasion, it is outside of the province of a court to determine the sufficiency of what constitutes a compelling reason when based on such subjective criteria as whether this change is "significant." In other words, Plaintiffs have pointed to no case where the USCIS or the Administrative Appeals Office granted an adjustment of status because the plaintiff showed compelling reasons, and that the denial of this specific adjustment is an irrational departure.

Relatedly, even had Congress defined "compelling reasons" and given courts "law to apply" with respect to that amorphous criterion, the rest of the statute evinces further intent that the decision to adjust status under Section 13 is committed to the agency's discretion by law. The statute requires that an applicant must show *both* compelling reasons they cannot return *and* that it is in the country's national interest, that they are of good moral character, and that adjusting their status is not contrary

to national welfare, safety, and security. 8 U.S.C. § 1255b(b). Even with a standard, the national interest, welfare, safety, security, and an applicant's good moral character, when given to a member of the executive branch to decide, are not susceptible to a court's evaluation and second-guessing. Thus, according to Section 13, an applicant could show a compelling reason for not wanting to return to their country of accreditation and the Secretary may refuse to adjust if the applicant does not meet other criteria which this court cannot review.

In addition, Section 13 applies only to former diplomatic representatives, requires the Secretary of Homeland Security to consult with the Secretary of State, and includes criteria of whether an adjustment of status is in the national interest and not contrary to national security. 8 U.S.C. § 1255b(b). The court agrees with Defendants that national security and international diplomacy are "peculiarly" within the expertise of the relevant cabinet secretaries, further suggesting that Congress did not intend for judicial review. *Gentile*, 974 F.3d at 319. In fact, national security is one of the classes of agency decisions which precedent has identified as being governed by a "tradition of nonreviewability." *Id.* (citing *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987); *Webster v. Doe*, 486 U.S. 592, 600-01 (1988).

Moreover, the Supreme Court has recently reaffirmed that decisions to admit or exclude "foreign nationals is a 'fundamental sovereign attribute exercised by the

Government's political departments largely immune from judicial control.'"

*Department of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) (*quoting Trump v. Hawaii*, 585 U.S. 667, 702 (2018)). Congress may, as it has here, delegate to executive officials "the discretionary authority to admit noncitizens 'immune from judicial inquiry or interference.'" *Id.* (*quoting Harisiades v. Shaughnessy*, 342 U.S. 580, 588-591 (1952)). While the court acknowledges that an adjustment of status is not the same as admission to the United States, the principle remains that noncitizen's status is not for courts to decide. Thus, this court is without power to review such decisions.

Lastly, the plain text of the statute supports that power to adjust status under Section 13 is conferred solely with the Secretary of Homeland Security. In relevant part, Section 13 states:

> (b)Record of admission. If, after consultation with the Secretary of State, it shall appear to the satisfaction of the Attorney General that the alien has shown compelling reasons demonstrating both that the alien is unable to return to the country represented by the government which accredited the alien or the member of the alien's immediate family and that adjustment of the alien's status to that of an alien lawfully admitted for permanent residence would be in the national interest, that the alien is a person of good moral character, that he is admissible for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.], and that such action would not be contrary to the national welfare, safety, or security, the Attorney General, *in his discretion,* may record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for adjustment of status is made.

8 U.S.C. § 1255b(b) (*emphasis added*). Congress did not merely imply a degree of discretion, it explicitly conferred sole "discretion" upon the Attorney General, or later the Secretary of the Department of Homeland Security. 8 U.S.C. § 1255b(b).[6]

Section 13 further provides that a maximum number of fifty adjustments may be made in any given year. 8 U.S.C § 1255b(d). The cap on adjustments is further indication that Congress did not intend courts to review the decisions, and the Secretary of Homeland Security must make the decision on who, if anyone, will receive an adjustment of status pursuant to Section 13.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, the court finds that it is without jurisdiction to decide this matter and the motion to dismiss will be granted.[7]

An appropriate order shall follow.

<u>/s/ Sylvia H. Rambo</u>
SYLVIA H. RAMBO
United States District Judge

Dated: July 22, 2024

---

[6] The Supreme Court has held that the use of the word "may" in a statute, though not "invariable," usually implies some degree of discretion unless "defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *United States v. Rodgers*, 461 U.S. 677, 706 (1983).

[7] The court notes that the foregoing analysis is only for the purpose of addressing jurisdiction. Nothing in this opinion is meant to comment on the merit of Plaintiffs' I-485 applications or the propriety of Defendants' denial of those applications.